IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TIMOTHY I. SIEGEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 15-CV-143-TCK-JFJ |
| BLUE GIANT EQUIPMENT CORPORATION, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| COMPSOURCE MUTUAL INSURANCE ) | |
| COMPANY (fka Compsource Oklahoma), ) | |
| ) | |
| Intervenor. ) | |

**OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment (Doc. 90) filed by Defendant Blue Giant Equipment Corporation ("Blue Giant"). Blue Giant seeks summary judgment against Plaintiff Timothy I. Siegel on Mr. Siegel's claim against it for product liability.

**I. Material Facts[1]**

In 2008, the Cherokee Nation of Oklahoma expanded The Cherokee Casino and Hotel (a/k/a "Hard Rock") to include a theater ("The Joint"), and hired Flintco Construction Solutions to be the Construction Manager on the project. (Doc. 90, Ex. 3, Self). The plans and specifications for the theater were prepared by Thalden Boyd Architects ("Thalden Boyd"). (*Id.*, Ex. 4, James

---

[1] Mr. Siegel denied and/or challenged each of Defendant's Statements of Undisputed Fact as being untrue or irrelevant. Accordingly, all statements of fact in this Opinion and Order are supported by appropriate citations to the record.

Self Dep., 23:19-23). Flintco sent out invitations to bid on providing the loading dock equipment, including a Specification for Dock Lift Equipment. (*Id.*, Ex. 4, Self Dep. at 22:10-20).

The Thalden Boyd Specification for Dock Lift Equipment specified the type, function, operation, construction and safety features of the lift to be bid upon. (*Id.*, Ex. 5, Specification, at ¶ 2.2). The Specification called for a 120" x 72" stationary Blue Giant LoMaster Series Model ED hydraulic scissor lift with a vertical travel of 59 inches. (*Id.*, Ex. 5 at ¶2.1(A)). The Specification mandated that the dock lift comply with ANSI MH29.1—the American National Standard Institute's published standard for Safety Requirements for Industrial Scissor Lifts. (*Id.*, Ex. 5 at ¶1.4(B)); Ex. 6, ANSI MH 29). The Specification also required that the dock lift be equipped with a "hinged bridge" with a lifting chain on one end of the platform. (*Id.*, Ex. 5 at ¶2.2(a)(4)(b)). According to ANSI MH29.1, a "hinged bridge" is a "hinged transition plate which is attached to the edge of the platform and used to bridge the gap between the platform and the land and/or truck bed." (*Id.*, Ex. 6 at ¶3.8).

Additionally, the Specification provided that the lift must be equipped with "removable handrails" and "chains provided at both ends between the rails," and it separately mandated which Safety Devices were to be installed on the lift, specifically: "handrails" and "safety chains." (*Id.*, Ex. 5 at ¶2.2(A)(4)(c); ¶2.2(A)(7)(e)). Handrails and safety chains are the required guardrail system set forth in ANSI MH29.1—Safety Requirements for Industrial Scissor Lifts. (*Id.,* Ex. 6 at pp. 18-19, ¶9.3, ¶9.3.1).

On June 17, 2009, Overhead Door Company of Tulsa faxed Blue Giant the Thalden Boyd Specification for Dock Lift Equipment and asked Blue Giant to "Please quote per the attached specification." (*Id.*, Ex. 7, Request for Quote; Ex. 4, Self Dep. at 27:21-24; 28:5-20; 29: 1-6). Thereafter, Blue Giant sent a quote to Overhead Door with shop drawings and technical data. (*Id.,*

Ex. 8, Quote; Ex. 4, Self Dep. at 29:23--30:6). Overhead Door submitted the Blue Giant shop drawings and product data to Flintco. (*Id.*, Ex. 4, Self Dep. at 31:10-12). The architect, Thalden Boyd, subsequently approved them. (*Id.*, Ex. 4, Self Dep. at 31:24-32:24; Ex. 9, Thalden Boyd Approval; Ex. 10, Dep. of Frank Sanders at 11:16-12:20). Overhead Door also provided Flintco with a brochure for the Blue Giant dock lift, which advertised the availability of optional safety devices in addition to the factor standard guardrails and safety chains, including closed gates and an additional roll-off prevention system. (*Id.*, Ex. 11, Brochure; Ex. 12, Brochure color copy, Ex. 4, Self Dep. at 26:22-27:12).

Overhead Door Project Estimator James Self, who procured the scissor lift from Blue Giant, testified that: (1) his request for a quote from Blue Giant was based on specifications he faxed to Blue Giant; (2) Blue Giant successfully provided the dock exactly as he ordered it; and (3) he believed the product was reasonably fit for the purpose that Thalden Boyd Architect intended to employ it at The Joint. (Doc. 90, Ex. 4 at 33:20-24, 35:2-14). Additionally, the Blue Giant shop drawings of the lift bear the Thalden Boyd Architects' approval stamp, indicating the architect who selected the lift confirmed it was reasonably fit for its intended use. (*Id*. at 32:10-24). Likewise, Overhead Door President Franklin Sanders testified that the Thalden Boyd Architects found the lift to be appropriate for its intended use. (Doc. 90, Ex. 10 at 12:1-6, 13-20).

Overhead Door purchased the subject lift from Blue Giant on March 9, 2012. (*Id.*, Ex. 10, Sanders Dep. at 29:12-15). Blue Giant manufactured and shipped the dock lift to Overhead Door, which began installation of the lift at the Joint on May 11, 2010. (*Id.*, Ex. 10 at 30:1-4). Blue Giant provided Overhead Door an Owner's Manual containing instructions and warnings, as well as a laminated placard containing warnings. (*Id.*, Ex. 14, Placard; Ex. 15. Dep. of Luciano Pelosi at 107:12-19). The Blue Giant owner's manual and placard instruct and warn users to ensure that

3

the guard rails and restraining chains across the open ends are securely in place prior to using the lift. (*Id.*, Ex. 13 at p. 10, ¶4; p. 12 ¶3, p. 13 ¶4). Additionally, it warns users never to use or apply weight to the hinged bridge unless it is overlapping a solid surface, and never to use the bridge if it is supported solely by its lifting chain. (*Id.* at p. 10, ¶10; p. 13).

Blue Giant provided the lift exactly as Overhead Door ordered it, in accordance with the product specification provided by Overhead Door. (Ex. 4, Self Dep. at 34:3-14; Ex. 10, Sanders Dep. at 9:22-10:21). Overhead Door's project estimator, James Self, and its president, Franklin Sanders, both testified that the Blue Giant dock lift was reasonably fit for the purpose for which it was intended to be used. (*Id.*, Ex. 4, Self Dep. at 33:5-24; 34:2; Ex. 10, Sanders Dep. at 9:22-10:21; 12:1-6, 13-20).

Overhead Door installed the dock at The Joint beginning on May 11, 2010. (*Id.*, Ex. 10, Sanders Dep. at 29:18-30:4).

On May 15, 2014, at 11:28 p.m., Mr. Siegel, who was working as a stage hand at The Joint, pulled a wheeled cart off the edge of the stage onto and across the lift. (*Id.*, Ex. 1, Video Recording). At the time of the accident, the hinged bridge was not stored in an upright position and secured by is safety chain, as required by the lifts' instructions. Instead, it was in its fully lowered position and was unsupported by anything but its lifting chain. (*Id.*, Ex. 1; Ex. 13 at p. 10:10). Rather than stopping the cart on the dock, as required by the product's instructions and warnings, Mr. Siegel pulled it onto the unsupported hinged bridge and off the open end. (*Id.*). Moreover, at the time of the accident, the safety chain was not in place across the open end of the lift, in contravention of the lift's instructions and warnings. *Id.* Mr. Siegel and the cart fell 46 inches to the floor, and he was injured. (*Id.*, Ex. 1; Ex. 2, Amended Complaint at ¶II).

Mr. Siegel testified he had never been given any instructions—oral or written—about how to operate the lift, nor had he ever been told to center the load on the lift. (Doc. 121, Ex. 5, Siegel Dep.at 55:18-56:25). Mr. Siegel was a professional stagehand who knew how to load and unload the truck, set up and tear down the stage, get it back to the warehouse and unload it again. (Doc. 90., Ex. 16, Siegel Dep. at 46:2-18). He understood the need to be careful and safe when working at height, including on the lift at issue, because falling from that height could cause an injury. (*Id.* at 48:7-13).

Defendant's expert Robert Giacetti, Ph.D, testified that had the factory-provided safety chain been in place across the open end of the lift, as instructed by Blue Giant, the chain would have prevented Mr. Siegel from falling and the accident could not have happened. (*Id.*, Ex. 17, Giacetti Dep. at 82:17-22, 86:21-87:22).

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986). The relevant legal standard does not change where the parties file cross motions for summary judgment, and each party has the burden

of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

**III.     Analysis**

In order to prove a claim for manufacturer's product liability, a plaintiff must establish (1) that the product was the cause of the injury; (2) that a defect existed in the product at the time it left the manufacturer's possession and control; and (3) that the defect made the product unreasonably dangerous. *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974). "Unreasonably dangerous" means "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* (citing the Restatement Second §402A, comment g). "The alleged defect may be result of a problem in the product's design or manufacture, or it may be the result of inadequate warnings regarding the use of the product." *Wheeler v. Ho Sports, Inc.*, 232 F.3d 754, 757 (10th Cir. 2000) (internal citations omitted). A product is defective when it is not reasonably fit for the ordinary purposes for which such products are intended or may reasonably be used. OUJI 12.2 (citing *Mayberry v. Akron Robber Mach. Corp.*, 483 F. Supp. 407, 412 (N.D. Okla. 1979)).

"[T]he mere happening of an accident raises no presumption of negligence on the part of the defendant . .. nor does it raise any presumption of defectiveness in the article involved in the accident." *Kirkland*, *supra*. A manufacturer has no obligation to build a "fail-safe" or "accident-proof" product." *Wheeler*, *supra*.

A product is unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge

6

common to the community as to its characteristics." *Smith v. U.S. Gypsum Co.*, 612 P.2d 251, 253 (Okla. 1980). The test is an objective one: "The issue, roughly speaking, is whether an ordinary person would think the product is less dangerous than it is." *Brown v. Sears, Roebuck*, 328 F.3d 1274, 1280 (10th Cir. 2003). A product is unreasonably dangerous if "its actual dangers exceed its perceived dangers." *Id.* at 1282.

In an industrial setting, the ordinary consumer is a skilled operator of the industrial equipment at issue. "Oklahoma law presumes. . . that a workman using a product is 'skilled at his job.'" *Castillo v Am. Laundry Machinery*, 74 F.3d 1248 (10th Cir. 1996) (unpublished) at *3, quoting *Hutchins v. Silicone Specialties, Inc.*, 881 P.2d 64, 67 (Okla. 1993). "Because a product might be unreasonably dangerous in the hands of a home handyman does not make it so when used on a commercial work site by professionals." *Hutchins*, *supra*.

Here, the undisputed facts establish that Mr. Siegel, who is an experienced professional stagehand, pulled a heavily loaded wheeled cart onto the lift and, instead of stopping the cart on the dock itself, pulled it onto the unsupported hinged bridge and off the open end. (*Id.*, Exs. 1, 2). He and the cart fell 46 inches to the floor. *Id.* Although another entity or person may share some responsibility for the accident, Blue Giant, which built the scissor lift to the architect's specifications and provided instructions on its use and warning placards of the hazards of operating the lift, is not legally liable for Mr. Siegel's injuries.

## IV. Conclusion

For the reasons set forth above, defendant Blue Giant Equipment Corporation's Motion for Summary Judgment (Doc. 90) is hereby granted.

ENTERED this 31[th] day of October, 2018.

**TERENCE KERN**
**United States District Judge**